# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CARLOS D. LINDSEY,**

    Plaintiff,

    v.                                                                                   Case No. 18-CV-1249

**DANE ESSER and**
**STEVEN SCHNEIDER,**

    Defendants.

## REPORT AND RECOMMENDATION

Carlos D. Lindsey is Wisconsin state prisoner representing himself in this 42 U.S.C. § 1983 action. The case is before me on referral for pretrial management from the Honorable Lynn Adelman. Presently before me are cross motions for summary judgment. For the reasons that follow, I recommend that Judge Adelman grant the defendants' motion for summary judgment and deny the plaintiff's motion.

1. *Motion for Summary Judgment*

    1.1    Undisputed Facts

As a preliminary matter, I note that I take the facts from both the defendants' and the plaintiff's proposed findings of fact. I also note that, as the rules governing summary judgment require, I will consider only undisputed facts properly supported by admissible evidence and will consider a fact disputed only if that dispute is supported by admissible evidence.

Carlos Lindsey is an inmate at the Wisconsin Secure Program Facility ("WSPF"). (Defendants' Proposed Findings of Fact ("DPFOF") at ¶ 1, Docket # 32.) Defendant Dane

Esser is a Supervising Officer 2 (i.e. Captain) at WSPF and has been since February 22, 2015. (DPFOF ¶ 2.) At the time relevant to this lawsuit, defendant Stephen Schneider was employed as a Correctional Officer at WSPF. (DPFOF ¶ 4.)

On April 27, 2018, the date of the incident underlying this lawsuit, Lindsey was housed on the Alpha Unit. (DPFOF ¶ 1.) Schneider was working his assigned post as Officer #2 on Alpha Unit. (DPFOF ¶ 6.) Around 5:40 p.m., Schneider was conducting mail pass. (*Id.*) When he reached Lindsey's cell front, Lindsey told Schneider that he wanted to speak with the Psychological Services Unit ("PSU"). (DPFOF ¶ 7.) Schnieder explained that PSU was not available because of the time of day. (DPFOF ¶ 8.) Lindsey told Schneider that he was having thoughts of self-harm and wanted to go on observation status. Schneider attempted to discuss this further with Lindsey, but Lindsey would not provide any additional information. (*Id.*)

Schneider went to the officer station in Alpha Unit and informed the sergeant on duty, Sergeant Joshua Kolbo (not a defendant), of Lindsey's statement about self-harm and wanting to go on observation status. (DPFOF ¶ 9.) Schneider then immediately returned to Lindsey's cell front and continued to attempt to communicate with Lindsey, but Lindsey refused to respond and paced his cell while Schenider monitored him. (DPFOF ¶ 10.) When Kolbo arrived at Lindsey's cell, Schneider went to the main hallway of the Alpha Unit to grab a door tether and Mark 9 incapacitating agents. (DPFOF ¶ 11.) Schneider returned to the cell, at which time Kolbo was trying to speak with Lindsey and figure out what issue Lindsey was having so that he could relay it to the security supervisors. (DPFOF ¶ 12.)

While Kolbo was speaking with Lindsey, Lindsey covered his cell hall window with paper and his door window with a towel, making it impossible for correctional staff to

visually monitor him. (DPFOF ¶ 13; Plaintiff's Proposed Findings of Fact ("PPFOF") at ¶ 1, Docket # 33.) Kolbo immediately directed Lindsey to uncover his windows, but Lindsey would not respond to Kolbo or Schneider. (DPFOF ¶ 14.) Alpha Unit staff contacted defendant Esser and informed him that Lindsey had covered his cell windows and that staff could not see in. (DPFOF ¶ 15.) When he arrived on the Alpha Unit, Esser learned that Lindsey had asked for the PSU, had reported thoughts of self-harm, had covered all his windows, and was not responding to staff. (DPFOF ¶ 16.) Esser immediately went to range 2, where Lindsey was housed. (DPFOF ¶ 17.) Schneider and Kolbo were at Lindsey's cell front, continuing to try to gain control and compliance from Lindsey by using verbalization skills. (*Id.*)

Initially, Esser decided that best court of action was to allow Schneider and Kolbo to continue their attempts to gain compliance from Lindsey and monitored the situation from a few cells away. (DPFOF ¶ 18.) After a significant amount of time, Lindsey told Schneider and Kolbo, "you know what's going to happen if you open that trap" and began to explain to Kolbo that he was upset with Unit Manager Brown (also not a defendant) regarding a situation with a television. (DPFOF ¶ 19.) Kolbo told Lindsey he would look into it but that Lindsey still needed to comply with the directives to uncover his window. (DPFOF ¶ 20.) Lindsey still refused to uncover the windows. (*Id.*)

After about 30 minutes without compliance, Esser went to Lindsey's cell front and Lindsey partially uncovered his cell window. (DPFOF ¶ 21; PPFOF ¶ 2.) Esser then began talking to Lindsey and observed that Lindsey was obviously upset and appeared to be sweating and shaking. (DPFOF ¶ 22.) Lindsey explained that he was upset because he had been promised access to a TV if he had good behavior and had not yet received the TV.

3

(DPFOF ¶ 23.) Esser informed Lindsey that because he had covered his cell windows and refused numerous staff directives to uncover the windows for an extended period of time, he would be placing Lindsey on a paper/property security restriction. (DPFOF ¶ 24; PPFOF ¶ 3.) This meant that Lindsey would have to be removed from his cell to confiscate all paper items, and Kolbo and Schneider were present to prepare to remove Lindsey from his cell. (DPFOF ¶ 24.)

Esser attempted to gain voluntary compliance from Lindsey to be removed for several minutes, but Lindsey refused to comply. (DPFOF ¶ 25.) Lindsey then turned his back to the cell door, making it impossible for Esser to see Lindsey's face. (DPFOF ¶ 26.) Kolbo, who had proceeded to the cell window on the hallway to view Lindsey, informed Esser that he believed Lindsey had placed a staple in his mouth. (*Id.*; PPFOF ¶ 6.) Neither Esser nor Schneider saw Lindsey put anything in his mouth. (PPFOF ¶ 9.) Lindsey told Esser that he did not have anything in his mouth. (PPFOF ¶ 8.) However, it appeared to Esser that he did have an object in his mouth; Lindsey's speech changed and he was not opening his mouth normally. (DPFOF ¶ 27.) Esser directed Lindsey to spit out whatever was in his mouth several times, but Lindsey refused. (*Id.*)

Non-deadly force may be used by correctional staff only if the user of the force reasonably believes it is immediately necessary to realize one of the following purposes: to prevent death or bodily injury to oneself or another; to prevent unlawful damage to property; to regain control of an institution or part of an institution; to prevent the escape of an inmate; to apprehend an inmate who has escaped; to change the location of an inmate; to control a disruptive inmate; and to enforce a Corrections rule, a posted policy or procedure, or an order of a staff member. (DPFOF ¶ 28.) The use of force policy also states that the

minimum standard for the use of incapacitating agents is an active resistance or its threat, or if the staff member authorizing the use of the incapacitating agents believes the inmate poses a threat of becoming resistive or assaultive. (DPFOF ¶ 29; PPFOF ¶ 18.) This includes an inmate being assaultive to themselves. (DPFOF ¶ 29.)

Esser believes it was necessary to immediately administer incapacitating agents to ensure Lindsey's safety. (DPFOF ¶ 30.) Esser felt that Lindsey's safety was at risk and his behavior was potentially assaultive to himself. (*Id.*) Esser tried to open the trap door and administer the incapacitating agent, but he was unable to do so because Lindsey stood directly in front of the trap door. (DPFOF ¶ 31; PPFOF ¶ 11.) Esser decided that deploying the incapacitating agent at that moment would pose a risk to both staff and Lindsey, so he closed the trap door. (DPFOF ¶ 31.) Esser sent Kolbo to retrieve a holder to assist in safely deploying the incapacitating agent. (DPFOF ¶ 32.) During this time, Lindsey moved away from his cell front and Esser opened the trap door. Esser directed Schneider to administer the incapacitating agent. (*Id.*; PPFOF ¶ 13.)

Schneider administered a one-second burst of incapacitating agent into Lindsey's cell, secured the trap door, and then told responding staff via radio to don the appropriate protective equipment. (DPFOF ¶ 33.) Lindsey came to the trap door and complied with removal from his cell. (DPFOF ¶ 34.) Non-defendant officers arrived at Lindseys cell and restrained him, conducted a pat search, and escorted him to the Alpha Unit medical room for treatment. (DPFOF ¶ 35.) A nurse was present and asked Lindsey if he would like his eyes flushed, which he refused. (DPFOF ¶¶ 36–37.) The nurse also offered Lindsey a Nebulizer because he was complaining of difficulty breathing, and he agreed to receive the Nebulizer. (DPFOF ¶ 37.) His vitals and lung functions were normal. (*Id.*)

Dr. Hoem arrived in the medical room from PSU to speak with Lindsey. (DPFOF ¶ 38.) Lindsey admitted to Dr. Hoem that he had a metal staple in his left arm, underneath the skin. Dr. Hoem asked Lindsey if he could remove the staple himself, and Lindsey said that he could. (*Id.*) Two officers removed Lindsey's right wrist restraint and secured his hand in front with a waist belt so that Lindsey would be able to remove the staple. (DPFOF ¶ 39.) Lindsey proceeded to pick a scab off the inside of his left wrist and worked his skin ip until a staple appeared from underneath his skin. (DPFOF ¶ 40.) The nurse removed the staple, cleaned the area, and provided Lindsey with a bandage. (DPFOF ¶ 41.) Once both Dr. Hoem and the nurse cleared Lindsey, officers escorted him to the strip cell on the Alpha Unit. (DPFOF ¶ 42.) The strip search yielded no contraband, and Lindsey was offered the opportunity to shower, which he refused. He was then escorted to cell 411 on the Alpha Unit and complied with being placed into the cell. (*Id.*)

1.2 Summary Judgment Standard

The court shall grant summary judgment if the movant shows that there ia no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

1.3    Analysis

Lindsey was allowed to proceed against Esser and Schneider on a claim that they used excessive force against him, violating the Eighth Amendment. (Docket # 10 at 3–4.)

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on convicted prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). When a plaintiff accuses a prison official of using excessive force, the court's core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). Several factors inform this determination, including the need for force, the amount of force applied, the threat the officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7, 112 S.Ct. 995; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

The Supreme Court has instructed that the question is not, viewed in hindsight and with its benefit, whether the force employed was appropriate, but whether the force was motivated by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). As a result, at summary judgment "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." *Id.* at 322.

In this case, there is no evidence that Esser or Schneider employed an incapacitating agent based on a wanton desire to inflict pain or suffering. The encounter began with Lindsey expressing that he was having thoughts of self-harm to Schneider, who then went to report what Lindsey told him. Kolbo reported to Lindsey's cell and Schneider followed shortly after. While Kolbo spoke with Lindsey, he covered his cell windows with paper and a towel. Then Esser was informed of the situation and went to Lindsey's cell range, where he observed Schneider and Kolbo try to get Lindsey to comply with verbal commands to uncover the windows. Lindsey told Kolbo and Schneider that he was upset because he did not receive a television he believed he was supposed to have in his cell. After about 30 minutes, Esser went to Lindsey's cell front, at which point Lindsey partially uncovered his cell windows and reiterated to Esser he was upset about the television.

At this point, Esser explained to Lindsey that he would be placing Lindsey on a paper/property restriction because he covered his cell windows and, as such, he would need to remove Lindsey from his cell. While attempting to gain Lindsey's compliance, Lindsey turned his back to Esser. It was at this time that Kolbo saw what he believed was Lindsey

8

placing an object that appeared to be a staple in his mouth, which he told Esser. Esser noted that Lindsey's speech changed and he was not opening his mouth normally. Esser directed Lindsey several times to spit out whatever he had in his mouth, but Lindsey refused.

It was only at this point, when it appeared Lindsey had placed a foreign object in his mouth and was refusing to spit it out or remove it, that any kind of force was used. And in fact, Esser did use the incapacitating agent right away because Lindsey's position in the cell would have posed a risk to Lindsey and to staff. Once Lindsey moved, Schneider deployed a one second spray of the agent and they removed Lindsey from his cell. Staff had been trying for over 30 minutes to get Lindsey to uncover his cell windows. Lindsey outright refused to comply with verbal commands with respect to his cell windows. But when he then refused to comply with verbal commands to remove an object from his mouth, Esser and Schneider took action to prevent him from harming himself.

The defendants had considerable discretion when deciding how to proceed in this situation. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (noting that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). The Eighth Amendment does not require the defendants to have acted with the "best approach," but instead only that they act without the subjective intent to wantonly cause harm. *Whitley*, 475 U.S. at 322.

Lindsey argues that he did not have anything in his mouth so any use of force was therefore unreasonable. However, the defendants acted based on what they believed, which

9

was that he had placed an object in his mouth that could result in harm.[1] There is no evidence they did not believe this at the time they acted. And they also made decisions in this situation with knowledge of Lindsey's many past self-harm attempts and clinical observation placements. (DPFOF ¶ 49.) Indeed, even his litigation history in this District belies his history of self-harm.[2]

The standard requires courts to look at several factors, including the threat the defendants reasonably perceived, *Hudson*, 503 U.S. at 7, and their perception was undoubtedly informed by Lindsey's extensive mental healthy and self-harm history. That is to say that his history would, in their minds, elevate the risk he would in fact harm himself—as he had done in the past. They attempted to get Lindsey to comply with verbal directives to remove the object from his mouth, but he refused. Esser and Schneider then determined that the best court of action was to use an incapacitating agent to gain Lindsey's compliance. On this record, there is no evidence that the decision to deploy a one-second spray of incapacitating agent was motivated by the desire or intent to cause harm. I

---

[1] Lindsey also mentions that inmates on observation status are not allowed to have staples or paper clips, presumably to try to argue that he could not have put a staple in his mouth because he was not allowed to have them. However, after being removed from his cell, Lindsey removed a staple that was embedded in his forearm. This undermines any notion that he could not have had a staple in his mouth.

[2] Lindsey has filed or been a part of 13 cases in the Eastern District of Wisconsin in the past six or so years: 14-cv-130, 15-cv-795, 16-cv-43, 16-cv-75, 16-cv-822, 17-cv-1724, 18-cv-258, 18-cv-259, 18-cv-323, 19-cv-296, 19-cv-849, 19-cv-888, and this case, 18-cv-1249. Many of these cases, including 16-cv-43, 16-cv-75, 17-cv-1724, 18-cv-258, 18-cv-323, and 19-cv-296 relate to Lindsey's self and, in some instances, the manner in which prison staff responded or did not respond. Lindsey is, in short, impossible to please when it comes to how staff responds to his threats of self-harm and self-harm. Lindsey even filed an inmate complaint in 2017 (before this incident) alleging that staff failed to take appropriate measure to prevent his self-harm because the did not use incapacitating agents or an extraction team in response to his threat to harm himself with a staple. (DPFOF ¶ 48.)

therefore recommend that the defendants' motion for summary judgment be granted and the plaintiff's motion be denied.

2. *Conclusion*

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion for summary judgment (Docket # 28) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that the plaintiff's motion for summary judgment (Docket # 22) be **DENIED**.

**IT IS ALSO RECOMMENDED** that this case be **DISMISSED** with prejudice.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b)(2) whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 7th day of February, 2020.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge